Case No. 25-3170, Buckeye Institute v. IRS et al. Oral arguments not to exceed 15 minutes per side. Mr. Weisbuck, you may proceed for the appellate. Good morning. Good morning. May it please the Court, Mike Weisbuck for the federal defendants. I'd like to reserve five minutes. Very well. Every year, trillions of dollars flow through 501c3s due to the double subsidy program that Congress enacted. 501c3s choose this subsidy program, and when Congress imposes a content-neutral condition on a voluntary subsidy, the question is whether the condition is rationally related to a legitimate government interest. This reporting requirement is nothing like a condition on the mere exercise of a constitutional right, as in Americans for Prosperity and other outright compelled disclosure cases, and it's nothing like conditions that leverage discretionary benefits to control protected conduct outside the scope. Doesn't it tell the 501c3 who they can associate with? They can only associate with donors who are willing to disclose their identity. Correct, but the question is, are you conditioning, are you requiring them to only associate with certain people full stop or exercise their constitutional rights, or are you doing that as a condition on a subsidy? No, you're doing the former. You're requiring them to only engage with donors who are willing to supply their names to the 501c3. But only as a condition on getting cash from the government, as opposed to a condition of soliciting cash from contributors to which there is a First Amendment right. Why isn't this just like AOSI, where the government said, we're only going to give money to certain groups, and those groups can't associate with others, and in the course of that, you went too far. You can't put that second restriction on that you can't associate with other groups because of their viewpoint. I think in AOSI, the issue was the organizations receiving funding had to affirmatively adopt a position. It was basically, you have to engage in compelled speech if you're getting funding. You couldn't engage with other groups that had a different view or something along those lines. They had to espouse a policy opposing prostitution to get funding for HIV and AIDS prevention. And so the 501c3s here have to espouse a policy that they won't associate with donors who won't disclose their names. No, I think it's different because in the AOSI-1 context, you're leveraging this funding to control speech that's outside of the federal program. So here, the federal program is a charitable subsidy system. If I could, Judge Radler, I think some of the confusion about the framework here, Buckeye paints this as, does it operate on the use of the funding or on the recipient? And I think maybe that's sort of what your question is getting to. I don't think that's the right framework. I think the correct framework is we actually have sort of three categories of cases, and I'm happy to kind of lay those out. So first, we have outright compelled disclosures. You have to give the government certain information just to function or exercise your constitutional rights. That's Americans for Prosperity. Second, you have conditions that regulate speech, like the AOSI-1 example you just gave. And there the question is, are we deciding where the subsidy funds are going? Is that the speech we're regulating? Or are we trying to control speech outside the federal program? But I think there's an important third category of cases for content-neutral administrative requirements. And the best example is Lewis Publishing. It's a case we cited in our opening brief a couple times. But how far does this rule extend? So the government, as part of a condition, could require the donors to produce all of their financial statements? Well, it still has to be rationally related to the government. Well, that's if you want to know whether there's fraud involved, you'd want to really dig into those organizations and get to their financial statements. Well, I think in certain instances it could extend to financial reporting. But I think just to give you – I don't think we're in that territory. How far does your rule extend? So it extends – to give you, by way of analogy, Lewis Publishing, federal law still on the books, required newspaper publishers to disclose all kinds of associational information about their ownership, their editors, their staff, in exchange for subsidized second-class mail rates. It's very similar to this case. And the underlying policy was that readers of these publications should know if what they're reading is as functionally an advertisement for interested persons. Now, what the Supreme Court said was these newspapers can opt out. They can pay higher mail rates. But they're opting in to this subsidy program. Congress can require them to provide that information because it's incidental – that's the word the court used – to the underlying subsidy policy. So the court was effectively applying rational basis review and saying that Congress could condition this subsidy program on a reporting requirement. Does it matter how you're using this information? Not for what level the standard of review is. I think you could get into whether or not a particular level is required. But I think if it's a content-neutral reporting requirement that's tied to a voluntary subsidy, it's rational basis review. Well, I'm not – I was – okay. But maybe how to understand how to classify this restriction. I think this is very debatable, how to classify it, and we're having that exchange. Yeah. Isn't it helpful to know how the IRS is using this information and for what purposes? I think – well, I think – You submitted a number of declarations that tried to explain how you're using the information. Well, and beyond those declarations, I just want to emphasize, I think everyone agrees, and the Supreme Court has said repeatedly, that our federal tax system runs on voluntary compliance that reporting promotes. And – That's not what I'm – I'm just – that's not what I'm asking. I'm saying – Sorry, I want to make sure I answer your question. I'm saying, isn't it important that we understand how you're using this information to understand the constitutional questions here, how to classify it? Is it a condition or not? And you submitted some declarations, so it seems to me that you also think it's important that we understand how the IRS is using this information to answer the constitutional questions. Yes. It is important when deciding the – when deciding the applicable standard, I think consistent with the sort of framework that I outlined earlier, it's at least important to know when you're deciding whether exacting scrutiny or rational basis applies, whether the government is leveraging this information to control protected conduct. So in that sense, I agree it's relevant. I do think those declarations were submitted to cover the government's bases in terms of we're not sure what level of scrutiny the court is going to decide applies, so we better, you know, provide some information about how – I don't think it's – I mean, you don't think it's at all relevant to then how we apply the scrutiny once we've determined what level? I mean, don't we have to know what we're – what the – don't we then have to know what the program is, how the program operates, how the government's using the information to then test that fact pattern against whatever standard we pick? I think when you're applying the standard, of course the court needs to know what the government is doing, but I think part of what the government is doing here is reporting that promotes voluntary compliance. So if there's some arbitrary threshold of, oh, with this information, this many audits were triggered, in a federal tax system based on voluntary compliance that reporting promotes, that's like saying you don't need an umbrella in a rainstorm because you're not getting wet. I guess my concern – I'll stop because my concern is this. There's not been discovery in this case. You've given us some ideas of how the IRS is using the information, but that's not been tested at all in discovery. So all we have are these declarations at the Rule 56 stage. And the Supreme Court in Banta was very concerned about how the trial played out and the trial record in that case, right? That was critical to the decision there, and we just don't have that record here. And this feels like a case that could very well go to the Supreme Court and would feel odd to send it in a posture that's quite different than Banta without sort of that factual development of the record. So that's probably my concern to kind of tie it up. It would be exceedingly odd if the same standard in AFP or Banta applies in this case, if the same standard for an outright compelled disclosure just to exercise your constitutional rights applies to a condition on a voluntary tax subsidy where Congress has the broadest latitude to make classifications. Now, I agree that there a trial was appropriate because we were applying exacting scrutiny. But under rational basis review, which is the appropriate standard for a voluntary tax subsidy, as confirmed by Lewis Publishing, I think it's going to be very hard to get around Lewis Publishing in this case. There's no need for further discovery or trial. Rational basis review can rest even on speculation about a rational connection between a condition and the government's policies. Here, there's much more than that. I mean, we have, again, the Supreme Court has recognized multiple times reporting involuntary compliance. And I think, Judge Radler, this is a little bit like Williams-Yuley concerning whether Florida could restrict judges from soliciting campaign contributions where the Supreme Court said this isn't really susceptible to – and this was applying heightened scrutiny, which I don't think applies in our case. But regardless, the Supreme Court said that sort of interest and means-end balancing isn't really susceptible to documentary evidence, but it's well-established in our case law, this interest in a nonpartisan judiciary. Supreme Court case law firmly establishes this interest in voluntary compliance that reporting promotes. And we do have declarations, several declarations, also explaining how the IRS uses this information. I'm happy to talk more about that on rebuttal. Well, you already have this – I don't want to – I'd be happy to keep going also if you'd like. You already have this power to investigate the 501c3s. That's set, right? That's separately – you have quite a bit of power, and that's identified, I think, in some of your declarations, the broad scope you have. So you could still utilize your enforcement scheme without requiring the disclosure of who the donors are. But we can't promote voluntary compliance through reporting, just using those powers. And that's a key distinction. And that's a distinction with AFP, because we're talking about how the government administers the federal tax system. There was no tax system at issue. This was just California's free-floating interest in policing fraud. Your hands are not tied in investigating. And I take it Buckeye is saying – Practically speaking, they are. No, they're not. There's a whole bunch of statutes that give you a lot of power to investigate the 501c3s. Right. We get over 200,000 Schedule Bs a year. And you ask for 2,000, but you only use, like, a couple hundred of them. It seems quite broad that you would want all this information to – This goes back to the umbrella and the rainstorm. I think you still have the power to do it, but also the extent you're using this information, it's on a very small group, even though you're requesting a dramatic amount of information from all these organizations. But, Judge Radler, that's completely ignoring the voluntary compliance that third-party reporting indisputably promotes. So whatever number of audits the IRS is able to carry out based on this information, that's not going to change the fact that reporting ensures a higher degree of compliance across the board. And this is how our entire federal tax system operates, reporting and voluntary compliance. So if there's some – if 200 isn't enough audits, if it needs to be 1,000, that percentage-wise, it's still going to be, you know, whatever. That's not going to change the fact that the Supreme Court has recognized over and over in cases like Biscaglia that this is how our tax system runs. I see one last question. I'm sorry. I said I wouldn't. But it's an interesting case. So do you think that, you know, plaintiffs like Bacow should have any concern that their information might be misused? In other words, you know, during the Baum administration, there was a lot of allegations that the IRS was targeting certain organizations. The DOJ later acknowledged that and apologized for it. Obviously, the current but then former president had his tax returns released. So is there any, you know, legitimate concerns that organizations like this, especially politically-oriented ones, should be concerned about what information they're giving to the IRS? Absolutely. Those concerns are legitimate as a general matter. I think weaponization of the tax law is a problem that we've seen. I think for this specific disclosure requirement, it's less of a concern. Buckeye has complained about being audited in the past for political reasons, and that's definitely a problem. This case doesn't address that problem because Buckeye could still be audited. They're not challenging the IRS's audit authority, as you pointed out. So those are real concerns. But grift is a big concern, too. And when you're talking about trillions of dollars flowing through 501c3s and a $60 to $100 billion subsidy program, we need these reporting requirements. I guess in every federal program, there's a lot of money at stake. The question is, how much can that infringe on First Amendment rights? I mean, money is always really important to the government, but the First Amendment stands solid against that. Totally agree, Judge Radler. But when it comes to a voluntary tax subsidy like this one, the Supreme Court has never applied heightened scrutiny. In fact, no court has applied heightened scrutiny. Happy to talk more about that on rebuttal. Hopefully I can steal a little bit of that. It just depends how you classify it, I guess, in terms of what scrutiny applies. Right, right. And I'm sure the other side will bring up Shelton, and I'm happy to talk about that on rebuttal as well. All right, any further questions at this time? Judge Cole. All right, you'll have your five minutes rebuttal. Thank you. Appreciate it. Let's hear from the plaintiff, Appelli. Good morning. Good morning. May it please the Court, Brett Nolan on behalf of the Appelli, the Buckeye Institute. The district court correctly held that exacting scrutiny applies because the donor disclosure law for 501c3 organizations does not specify the activities that Congress wants to subsidize. And so it falls outside of whatever discretion Congress might otherwise have to impose conditions that limit the use of federal funds. That rule comes straight from the Supreme Court's decision in Alliance for Open Society. While there are some cases that it might be difficult to apply, this is not one of them, which is why if this is such an easy case, how come it hasn't been challenged since the tax code of 69 was passed and signed by President Nixon that Congress added this, the substantial contributor disclosure? If it is so clear, why hasn't it been challenged in over 50 years? I think it's no secret that Bonta had a significant impact on the way we think about exacting scrutiny and narrow tailoring. Before Bonta, there was no First Amendment violation of association problem here? I don't know. I mean, I think that there probably always has been. I think it's just odd that nobody's challenged this. Sure. And I don't know why other organizations haven't challenged it before, but it's clear in our complaint that a lot of the motivation from this is the way Bonta.  All right. I mean, the argument is that this constitutional right existed all the time, and it's just odd. The other thing is the district court, you moved for summary judgment, too, did you not? Yes, Your Honor. So you said that there is no genuine issue of material fact, that you're entitled to summary judgment. They argued the same thing. Now you're defending the district court's decision to allow, I guess, an evidentiary hearing as to the use and need of the disclosure information to establish a record. Here, this act was passed in 69, and there were congressional hearings, were there not, in 1969, that showed the abuses of alleged contributions to 501C organizations and the need for the IRS to double check whether these contributions were actually made or were they fraudulent? And, I mean, isn't, my question, isn't there a record, a congressional record on this from 1969 as to the hearings and as to the stated purposes from the Senate and the House in passing this statute? I don't think that there are detailed congressional findings about the way this information There wasn't a hearing? You're saying there wasn't a congressional hearing in 69? I'm not saying that. I'm saying that I don't think there are any detailed congressional findings about the way this information in particular would be useful. I thought the opposite was true. Maybe this comes from the amicus brief from New York. But I thought that the problem and the need for this disclosure was all exposed in 1969, more than 50 years ago, and that if there's a record as to why this is important, we could go back and see what Congress had before they acted. I haven't seen I don't see why the district judge has to do the same thing that Congress did 50 years ago. I think there are maybe two different questions there. So the first is that I don't think that I've seen anything that's specific about Schedule B information and how it would be used relative to the other information that the IRS also collects and was added when this law was passed, more reporting information about the way excise taxes and transactions take place. A second question, though, is when Congress passes this law, perhaps Congress believes genuinely that this information will be helpful. But then, over 50 years, when you have things like Schedule A and Schedule L, which already require organizations to report certain information about substantial contributors or transactions with disqualified individuals, you get into the world that Bonto was facing, where the court says, we have no qualms with the idea that the government has an interest here, but the evidence shows that no one is actually using this information. And so if we have evidence, if we go through discovery and find out that this information does not offer any real marginal benefit compared to the information that the IRS already collects, then we can hold the act of Congress unconstitutional, because Congress didn't really need it, I guess. I think that's what the Supreme Court did in Bonto, when it said that this is unconstitutional because Well, Bonto, that was a state, that was California regulation, was it not? Correct. That was an act of Congress. And also, in Bonto, I mean, you want to distinguish the Reagan case, but Bonto actually cited Reagan favorably, did it not? That's correct, Your Honor. It cites Reagan in the part of the court's opinion where it's talking about how to apply exacting scrutiny. We distinguish Reagan on the court. For another, it says, revenue collection efforts and control of tax-exempt status may raise issues not presented by California's disclosure requirement, which can prevent charities from operating in the state altogether. Now, isn't that a distinction that they made, that the California requirement would prevent charities from operating at all? Here, 503Cs, C3s can operate, but if they want a tax-exempt status, they have to comply with Congress's dictate that substantial donors be disclosed. I mean, they could still operate, could they not? They just wouldn't get the tax exemption for the benefit? That's correct. There's a big distinction there between California's scheme and the IRS scheme, is there not? We have no dispute that there are differences between both the state's interest and the burden on organizations in this case and in Bonta, but both of those questions go to how does exacting scrutiny apply, not whether exacting scrutiny applies. I don't know if we apply exacting scrutiny. Reagan has not been overruled, and they applied on a rational basis, did they not? That's correct, and when the Supreme Court cited Reagan in the Alliance for Open Society case, when it articulated exactly the same rule that we're articulating here, when my friend on the other side stands up today and he talks about this third category of cases that's not really mentioned in the briefs and he cites the Lewis Publishing case, that case is only cited in the briefs in a string site, I think two or three times, and the reason for that is that it was issued in 1913 before ideas like exacting scrutiny, before Perry v. Sindelman ever came to be. We think that what Reagan says applies in this case as well. We think it's distinguishable because what the condition is doing is different than what the condition was doing in Reagan. But Reagan also talks about the reason why Congress has discretion and doesn't have to face heightened scrutiny is because the restriction on lobbying specifies what activities Congress wants to subsidize. That's the language the Supreme Court used in Alliance for Open Society, and that language also appears in Reagan, which is why the Supreme Court in Alliance for Open Society cited Reagan for the rule that it's proposing. So we're distinguishing Reagan not because we think that what Reagan is wrong or it's been overruled, we think that it lays forth exactly the rule that we think applies here. It just comes out differently because the disclosure law here is not a condition that is specifying what activities a 501c3 organization can engage in. It is a condition that operates on the organization and its donors, just like the compelled speech condition in Alliance for Open Society operated on the organization itself and had effects when it was working beyond its subsidy. So, for example, when the Supreme Court talks about why the compelled speech condition is inherently beyond the program, unlike Reagan, it gives an example of an organization that adopts this policy and then tries to work with an affiliate that doesn't have this policy, and the court says it's impossible to do. You look like a hypocrite. There's no way you could actually ever work with an affiliate when you're saying one thing and your affiliate is saying something different. You have similar problems in this case where the condition operates on the donors and the organization. If this information, for example, were to ever be leaked out, which is the concern when you're talking about the First Amendment protections for chilled speech, the fact that a donor has associated with Buckeye and might face effects from that are not limited to that donor's association with Buckeye. The harassment, the reprisals, the social ostracism that the Supreme Court has identified in Bonta and McIntyre and all of these cases extend beyond the relationship with Buckeye because the condition operates on the recipients, not simply on the program itself. That's different than when you're talking about Reagan and you have a condition that says here's some money and here's what you can do with the money. You can engage in charitable activity, but you cannot engage in lobbying. Here, the Buckeye Institute is receiving exactly the same subsidies that were at issue in Reagan, but the condition is doing something very different. Whether or not the Buckeye Institute reveals its donors on a Schedule B or not, the activities are exactly the same. The Buckeye Institute doesn't change anything that it does based off of whether or not it reveals its donors' identities or not. That's what makes the condition here operate differently than the condition in Reagan. That's exactly the line that the Supreme Court articulated in Alliance for Open Society when it said that the line is that Congress has more discretion when it is choosing what activities it wants to subsidize. We think that Alliance for Open Society meshes exactly with what the court said in Reagan. It just comes out differently in this case for the same reason that it came out differently in Alliance for Open Society. In other words, Reagan and AOSI apply the same rule but come out differently and you think your case is much closer to AOSI. We have to decide that. That's exactly right. AOSI is a compelled speech. This is a compelled disclosure. But we think that they operate similarly under this framework because neither of those things are restricting how the organization, what it spends its money on. Can I ask a couple of questions to follow up on what Judge Griffin asked? I thought those were good questions. He was sort of asking about the timeline. So the government's primary case is over 100 years old, Lewis. And you have a 1969 statute. And then you have Bonta, which obviously changed the legal framework for us. The Supreme Court oftentimes sort of changes legal frameworks and then parties respond to that. But wasn't there another change? Wasn't there a point where 501c4s, maybe a regulation, were removed from this scheme as well? That's also true. So you have in— That was more recently, right? It started in 2018, and then I think it ended in 2020, where at the same time that you had this law, there was a regulation that required the same disclosure for all these other organizations. I think it's important that a lot of the reasons that this law, the government says they need this information for, a lot of those reasons also apply to 501c4s or other organizations. The restrictions on private endowment, the restrictions on excise taxes, for example. In other words, the government changed the rules, again, in 2018 or 2020, right? Correct. In other words, if you're wondering why Buckeye hasn't sued, another reason would be that the government changed the rules, which gives you a little bit of a stronger comparative case to the way they're treating 501c4s. That's right. As part of that, it is now in the Federal Register that the government has acknowledged that these create important privacy risks by collecting this data and holding on to it, that there are risks that this data could be leaked out. That's published in the Federal Register in 2020. That did not exist beforehand. The government coming out, and we have in the record at record 36-A, I think page ID 241, there's a presentation, I believe from 2018 from the IRS, where they talk about how they don't even have the ability to electronically match individual taxpayer returns with the Schedule B, and so they can't even use it for any kind of systematic fraud protection. That is also new information, evidence that we have obtained, and we think there might be more out there. Can I ask you one? Judge Griffin also asked you about the legislative history in this case, so the pre-enactment legislative history. We obviously know what Justice Scalia would say about legislative history. We shouldn't look to it because it can be abused or tailored in certain ways, and it's not always fully reflective, but is your view that we should rely on legislative history? I don't think it's our view that you should rely on legislative history, but when you're talking about exacting scrutiny, certainly Congress has the ability to make congressional findings. Congressional findings have been cited in Gonzales v. Carhartt, for example, right? But once you're in exacting scrutiny, you don't just take whatever the congressional findings were and say, okay, the government has told us kind of the answer, and so the court doesn't have any power to look at that. I think that under Bonta, it is clear that the government has to substantiate what it says. Now, if we were standing up here and saying we accept all those congressional findings and we think that we win regardless, then maybe you don't need discovery, but that's not our position. We don't think that this information is actually useful. And so I don't think the court would have to disregard congressional findings, which is different than maybe disregarding a floor speech by a particular senator, and the court could say, well, I don't think that necessarily tells me a lot about the purpose. If you had some sort of congressional findings and testimony, I think it can go into the mix, but it's not a way to shield yourself from discovery. I think Judge Griffin also kind of asked about discovery in the record, and I asked your friend on the other side. So in your summary judgement brief, you did say that more discovery could be necessary if your motion is denied, right, at the end of your brief? That's correct. Yeah, and so Judge Griffin, you asked about this kind of at the outset. We think that on the record as it stands, we could be entitled to summary judgment because we don't think that what the government has put forward satisfies exacting scrutiny, and we disagree with what the government says about how it uses it, but we don't think it's enough. If there is a factual question about how the government uses it, we indicated below in our response to summary judgment that we need discovery on that issue. We filed a 50-60 affidavit. I guess my concern is the government seems to think that's important because they filed five or six declarations with a number of facts. You haven't had a chance to test those. This feels like a case that could go to the Supreme Court, and I would be worried about us sending an incomplete case to the Supreme Court without a more developed factual record. Bonta, again, there was a bench trial, right, so the Supreme Court had a full record in front of it, and then it could judge the constitutional issues. I think you think it could mean more discovery. That was my sense in terms of giving the Supreme Court a full record. I agree with you to the extent that if the court holds that exacting scrutiny applies, which we think it should, it would be very strange to decide that question when you have what is a clear factual dispute about whether the government actually uses this, and then send that up to, you know, it could go up to the Supreme Court. But because exacting scrutiny, I think you read Bonta, if that's the standard that applies, it's very clear that the same factual issues that exist there exist here, and we could go through discovery and maybe we're wrong and summary judgment would be appropriate. I don't think that's realistic, but I don't see any world in which you have exacting scrutiny as the standard. You have declarations from the government about how they allegedly use this. Those witnesses have never been cross-examined, and we're going to make factual findings in favor of the government on that kind of record. So I just want to make sure I'm clear on what sort of factual determinations might be necessary, what disputed facts might exist if we agree with your argument that this is a compelled disclosure. So I guess I heard that maybe you need some determination of how the government uses the information. Is there anything beyond that that would be necessary, or is this just a wide panoply of possibilities that might arise in terms of factual disputes? I think for our purposes, that's the primary factual dispute that we're looking at. It's the factual dispute that Judge Watson, in his opinion below, identified. Again, if you go and you sort of read the way Bonta describes it, it explains what the government says that it needs the information for, and then it says the government's witnesses failed to substantiate that concern. We haven't been given an opportunity to cross-examine those witnesses or an agency representative to find out what do they really mean in these declarations, how often are they using it. The court also says things like even if they could have identified a few cases in which this information was important, that's still not enough for exacting scrutiny. So just figuring out how often, what's the scale of this, what is the evidence that this actually helps that this particular example. Basically, I guess you would want to have an opportunity to essentially cross-examine what has been set forth in declarations, which have not been tested by any sort of cross-examination. That's right, and we have in the record, I again pointed to record entry 36A, which is this presentation that the IRS gave. We don't know if there are other documents out there that might say things about how this information actually isn't that useful. It seems odd to me that we would declare an act of Congress unconstitutional because the IRS doesn't implement it as often as perhaps Congress wishes they would or because they don't have the technology to date that Congress wants them to have. I mean, it seems to me odd that that's what you want. You want us to declare an act of Congress unconstitutional because the way it's not fully implemented has accordance with their wishes of Congress. Well, I don't know. I guess I would push back on that it's not fully implemented. If they had done more, if they actually acted the way Congress wanted them to act, then it would be probably okay. It would satisfy the exacting scrutiny standard that you wish us to apply if they did this or that, and that's a function of evidentiary record, I think, that if the IRS could prove that, then they would exceed the standard. I think that our argument is more that the information is not useful. It's not that the IRS – Useful. Okay, isn't that a congressional determination? And you're second-guessing Congress's determination from 69 that's been in effect 50 years? The Supreme Court very clearly in Bonta says that the government has to substantiate the basis for needing the information. So under exacting scrutiny, we're asking this court to do exactly – But then you're saying whether it would be useful or whether it is useful. All right. I thought you were saying – I'm not sure why I come out on this. I thought you were saying that we need to understand how the IRS uses its information because it's going to inform the speech concerns that are at issue. And so one of the declarations that the government filed says that they use Schedule B to determine whether something's a private foundation or a public charity. But we have no idea how often they're making that determination, what they're using that information for, and doesn't all that inform – Not the congressional – I mean, we have the congressional statute, but how the IRS is actually deploying the statute and how it's utilizing it. It's exactly right. Again, I would point to Record 36-A, page ID 241 for an example. In this presentation, the IRS gives where they say that they actually use Schedule A for that because Schedule A gives them the information they need from that, not Schedule B. And it's not just, Judge Griffin, that they're not technologically able to do it. It's that the information collected is not even enough information in order to do that cross-checking. And so – Information's not – okay, explain that to me. If somebody claims on their tax return that I donated $100,000 to a 501c3 organization and then the organization says, no, we have no record of that, I mean, that does cross-check, does it? The IRS is not able to do that in any systematic way because – Not able to do it with the technology? I mean, Congress, I think, assumed they could do it and makes sense they should do it. But you're saying because they don't have the technology right now, we should declare the act of Congress unconstitutional? What the IRS says is they can't do it because they don't get taxpayer ID information on any of these forms. Taxpayers don't report this information themselves, right? So it's only on the Schedule B. And so if you're talking about – again, like in Bonta, this is not about having one tax return. And then you want to go ask for more information and verify something. This is about collecting 200,000 Schedule Bs every single year. And there's no ability to systematically cross-check a Schedule B with a tax return. The information's not on an individual tax return. There's no taxpayer ID to link this up. So if you're talking about a world in which the government is looking at a particular tax return and it wants to go and get this information, that's a totally different system than what we're concerned with, which is the mass collection of these where they just then get stored by the IRS even though nobody's actually looking at them. And that was the same issue in Bonta. It is not a question about whether the government could access this information.  They also argue voluntary compliance. You say, well, the tax IDs aren't there, so therefore systematically it's hard to match up whether somebody's committed fraud by saying they donated to a 501C3 when the tax information, the IDs aren't there. So it's hard to do it. But they argue, well, our whole tax system is based upon voluntary compliance and that this disclosure requirement mandated by Congress fulfills that or furthers the voluntary compliance with somebody who makes or claims to make a donation, thinking, well, this is going to be disclosed to the IRS by the charity and therefore I better have made it. I better not commit fraud. And I think the records do show that Congress was very concerned about fraudulent claims of making contributions to 501C3s in 1969 and that that was the impetus for this. But isn't the voluntary compliance aspect of that, doesn't that further a substantial government interest? It might. We haven't been able to do discovery on what evidence that the government has. It doesn't make common sense. I mean, you agree with me that our tax system is based upon voluntary compliance, don't you? I do agree with that. But I think our issue is whether or not this particular amount of information has any marginal benefit on voluntary compliance. As a different branch of government, I can second-guess Congress a lot, but I see my role as much more limited and allowing the other branches of government to do their functions and to implement their policies unless it violates the Constitution. And not because maybe there's a better policy, maybe it doesn't work as well, and all these other things that I think that the evidence you're hearing would be about as opposed to the constitutionality. I agree with that, Your Honor, and let me just give you two points. Again, that's what Bonta says that the standard requires. We are making a constitutional claim, and Bonta says that under exacting scrutiny this is what the government needs to prove. There's no special benefit to the federal government versus the state government, and Bonta doesn't say anything like that. This is what the federal government needs to prove. Bonta's very clear that exacting scrutiny applies no matter the context of associational privacy. I would also point the Court to the Ted Cruz for Senate case, which in dealing with talking about the government's interests, it has a line at the very end of this that says, like, deciding the constitutionality of a law is the prerogative of an Article III court. You don't just defer to what Congress, you know, thinks or says might be helpful or beneficial. I think that if we're at a point where exacting scrutiny applies, you have to follow what Bonta says that means in practice. Okay. Very good. Well, we're way over time. Any further questions? Thank you. All right, thank you very much for your argument, Mr. Knoll. Five minutes rebuttal. I appreciate the close attention the Court's paying to these issues. It is an interesting and challenging case. I'll try to make a few points and answer any questions. First, Judge Griffin, you noted that an organization could still engage in anonymous association but just not get the benefit of a tax exemption. It's actually, an organization actually still would get a tax exemption while associating anonymously as a different 501C. They just wouldn't get the double subsidy that comes with deductible contributions. So a 501C-4, for example, is still tax exempt. It's just that the contributions aren't deductible. So that's really what's being conditioned here is the double subsidy. It's not even just a single subsidy. And that kind of leads me to my next point. Judge Radler, I don't agree that this is a Regan versus AOSI-1 and what are we closer to, but AOSI-1 did emphasize that affiliates can play an important role when they, quote, allow an organization bound by a funding condition to exercise its First Amendment rights outside the scope of the federal program. I think that language is totally inapt when it comes to Bonta but fully applicable here. And I also don't quite agree that Bonta changed the law. I think Bonta purported, and I think correctly purported, to apply longstanding principles in outright compelled disclosure cases, which have always been subject to exacting scrutiny. That's not this case. And I don't think it's an answer to Lewis Publishing to just say, well, that's an old decision. The case that they relied on most maybe after Bonta in their briefing, Shelton, also predated tiers of scrutiny analysis. And frankly, I actually think that's their best case. I think it's a better case for them than AFP because it didn't involve an outright compelled disclosure technically because it concerned the employment of public school teachers. And you could at least make a technical argument that that's a discretionary benefit. The problem with that argument and why AFP still treated it like an outright compelled disclosure is that public employment is different. There's a whole body of doctrine about the First Amendment rights of public employees. And, for example, Minnesota. Can I go back to Dr. Griffin was asking the good questions about sort of, you know, the role of Congress versus the role of the courts. And so Congress passed the statute. But if we decide exacting scrutiny applies because it does brush up against First Amendment interests, which Congress may or may not consider, but we have to, then we have to ask whether this statute is narrowly tailored. And here you require the statute or you require disclosure of anyone who's given more than 2 percent of the 51C3's funding. Right? So if someone gives 2.1 percent, you require their disclosure. And it's hard to understand how someone who gives 2.1 percent could have some significant nefarious influence on the 501C3. For example, the rule could have been you have to disclose your top three donors. And they're much, much more likely to have some kind of improper influence or something. But this sweeps really broadly. Two percent is a pretty low number. So that's something we have to consider, right? Well, a few points. Under rational basis review, which I strongly— I didn't say rational basis review. Under exacting scrutiny, narrow tailoring, of course you have to consider narrow tailoring. But a few things. First of all, this requirement actually doesn't apply to the vast majority of 501C3's. It applies to relatively large, nonreligious 501C3's. That two—I mean, we're talking universities, hospitals, obviously some smaller institutions, but also, like, really big institutions. Does it apply to Buckeye? Sorry? Does it apply to Buckeye? Yeah, and that two percent gets you to $50,000. But Buckeye's not a real—Buckeye's not a university. Of course not. It's much smaller. No. So you're kind of—I'm not sure you're fully representing the scope application of the rule. It also applies to very large organizations, I understand. But it applies to smaller ones like Buckeye. It's a, you know, sort of typical policy organization. It applies to about 15 percent of 501C3's. And even then, like you said, it applies to the greater of $5,000 or two percent. Practically speaking, that's usually the two percent. In Buckeye's case, that's $50,000 about a year. I don't think that's an unreasonable threshold to look at undue influence. And remember, even Bonta stressed narrow tailoring doesn't require least restrictive means. It doesn't need to be perfectly tailored. No, but it does sweep pretty broadly. And you can imagine ways that the government could do this that would sweep less— get a lot of important information, but would sweep far less broadly. Sure, but again, I think imagining other ways, that's more of a least restrictive means analysis. No, it's a way to consider how broadly it is if it's narrowly tailored. I'm not saying it has to be that way. There's just other ways they could do it. Sure, but okay. So let's just take a step back on narrow tailoring. Congress limited this to about, practically speaking, about 15 percent of 501C3's, relatively large 501C3's. Congress further limited it to contributors who give at least two percent, practically speaking again, at least two percent to those 501C3's. Congress did that based on decades of experience, rampant abuse of the double subsidy program. And then Congress also only targeted 501C3's, which created this 501C4 option, which of course by regulation went away, but now, as you mentioned, is back, where organizations can use a 501C4, not report their contributors at all. I don't really see how it cuts against us that that changed a few years ago, because before there was no 501C4 option where you could be anonymous. You had to give that information on your Schedule B, too. Now you can. That seems helpful to us, to me, because for an organization, if they have contributors that value anonymity over the deduction, they can go that route. If they have contributors that value the deduction over anonymity, they can go that route. I think that's a fairly narrowly tailored regime, and I think it's helpful for the government. I have a question. Do you think there's a scenario where there would be disputed issues of fact, whether we looked at the substantial contributor requirement as a compelled disclosure or a condition of funding, that your opposite side argues that there would be a number of disputed issues in terms of attacking the declarations and matters of that sort? I'm just wondering what your government's position is. The government's position is that even under exacting scrutiny, we should win as a matter of law, if only based on voluntary compliance that reporting indisputably promotes. Now, I don't think that Buckeye needed Discovery below to fight that point. They didn't. We pointed to reports. You can see ECF 54, page 13 of our summary judgment briefing. We pointed to Joint Committee on Taxation Reports about how third-party reporting promotes voluntary compliance. I don't understand anyone to disagree with that being a sort of cornerstone of the federal tax system. Nothing prevented Buckeye from trying to marshal contrary evidence on that point below. Yeah, they didn't get to do Discovery. You don't need Discovery to do a report on whether or not reporting promotes voluntary compliance. If they want to test the veracity of your statements in your declaration, one way to do that is through Discovery. You're relying on your declarations, I think, as part of your presentation. Those statements aren't about the statements I'm talking about. Those are reporting promoting voluntary compliance. I think the statements you're talking about, Judge Radler, are about how often the information actually gets actively used to perform an audit. So one is not susceptible to, I think, a deposition or cross-examination. That may be documents. They want documents. About reporting promoting voluntary compliance?  I mean, the government has information they haven't disclosed publicly. We've pointed to public research documents. They may have documents that aren't public. And Buckeye doesn't know that. I don't know that. You know. I mean, Judge Radler, if you're suggesting that there are documents proving that there could possibly be documents proving that third-party reporting doesn't promote voluntary compliance in the tax system, that would be somewhat shocking to me because I think that's well accepted and the Supreme Court has said that over time. Again, I think it's like the Williams-Uly example where this is an interest that we sort of recognize as a matter of precedent because it's how our whole federal tax system operates and sort of commonsensical. But one more point on this false dichotomy between the recipient of funding and how the funding is used. When I read their briefing, I understood that argument to be based on a snippet from Russ V. Sullivan that, you know, we've had a problem when Congress has placed a condition on the recipient. Both Buckeye and the district court omitted the rest of that sentence, which makes clear that what the court is talking about. It says, quote, thus effectively prohibiting the recipient from engaging in protected conduct outside the scope of the federally funded program. That's the leveraging problem that I talked about. That's talking about restrictions on speech. We look at whether we're leveraging those restrictions to control unrelated conduct or whether we're just deciding where the subsidized funds are going. Like I said, I think this is a third category of administrative requirements. Rust itself approved additional administrative requirements requiring separate facilities, personnel, and records on organizations that wanted to engage in this other conduct. Those are conditions on the recipient of the funding, and Rust upheld them. So there's no way that this use versus recipient rule is the correct framework. Okay, Counselor, we're way over time. Any further questions? Judge Cole, Judge Radler? All right, thank you, Counsel. Thank you very much. Very informative oral arguments. I believe that concludes our oral argument docket today. With that, you may adjourn the court.